IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN E. GRIFFIN,** | : | **CIVIL NO. 1:CV-06-02445** |
| **Plaintiff** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **MELVIN S. LOCKETT, R.M. LAWLER, A. LOVETT, SCOTT WALTERS, and DONALD T. VAUGHN,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

This matter comes before the court on Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment. Plaintiff has brought this suit *pro se* under 42 U.S.C. § 1983, alleging First and Fourteenth Amendment violations by various prison officials. The court has carefully considered the papers submitted by the parties. For the reasons that follow, Plaintiff's motion for summary judgment will be denied and Defendants' cross-motion for summary judgment will be granted in part and denied in part..

## I.     Background

### A.     Facts

Plaintiff acts *pro se* and brings this suit while serving a life sentence without possibility of parole. (Doc. 96 ¶ 35.) Plaintiff, a forty-year old inmate incarcerated since 1987, is currently housed at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI-Huntingdon"). (*Id.* ¶¶ 36–37.) He has been housed in SCI-Huntingdon since September 22, 2004. (*Id.* ¶ 36.) He has been housed at several other state correctional institutions, including a previous stay at

SCI-Huntingdon during which prison guards, Plaintiff alleges, subjected him to mistreatment. (*Id.* at ¶ 38.)

Plaintiff, upon returning to SCI-Huntingdon, drafted two letters to Central Command at SCI-Camp Hill in which he requested transfer to a different correctional institution out of fear that SCI-Huntingdon guards would retaliate against him. (*Id.* ¶ 39.) On September 27, 2005, Plaintiff drafted and mailed a third letter ("the Letter") to Central Command. (Doc. 97-4.) This third letter did not mince words. In a crisp tone and straightforward style, Plaintiff expressed his frustration over Central Command's failure to address his previous letters:

> I wrote to Central Office twice, so therefore this is my third time. I did't get any response the first two times, and don't expect a response this time. They no my situation, they also know that I do not suppose to be here at Huntingdon State Prison, because of what happened to me here . . . I try to respect people, But central office disrespects me, knowing whats going on, so fuck all you racist motherfuckers, and hope you bastards die a violent death. What you want me to do, be these cowards friend, after the shit they did to me. Im not playing any games these people fuck with me one more time, how do you think I seeing the same chumps, who did crazy things to me in the hole, all in retaliation for something that happened at another prison. And for you people, you racist bastards no you are wrong, so fuck all of y'all killers.

(Doc. 97-4)

In response to the letter, the Department of Corrections conducted a disciplinary hearing on October 25, 2005 and found Plaintiff guilty of threatening an employee and using abusive language. (Doc. 97-5.) Plaintiff received a sentence of sixty days in Disciplinary Custody in the Restrictive Housing Unit ("RHU"). (*Id.*)

Correctional institutions have different levels of housing for inmates based on the inmates classification. (Doc. 96 ¶ 1.) SCI-Huntingdon houses most inmates in the "general population." (*Id.* ¶ 2.) Some inmates, however, may be housed in the RHU for a number of different reasons, including situations in which

the correctional institution finds an inmate guilty of violating an institution rule.  (*Id.*
¶¶ 4–6.)  Moreover, an inmate may self-confine in the RHU if he has a safety
concern with regard to the institution staff or other inmates in the general
population.  (*Id.* ¶ 9.)  Inmates confined in the RHU receive periodic reviews from
the Program Review Committee ("PRC") to determine whether the inmate should
remain in the RHU.  (*Id.* ¶ 11.)  Inmates confined in the RHU are assigned a
counselor who meets with the inmate on a regular basis and makes recommendations
to the PRC.  (*Id.* ¶ 12.)  An inmate may be denied release from the RHU if he
remains a danger to himself or others or has exhibited a negative adjustment during
PRC reviews.  (*Id.* ¶ 14.)

      While serving his time in the RHU, the SCI-Huntingdon staff requested
a transfer of Plaintiff from SCI-Huntingdon to another state prison.  (Doc. 96 ¶¶
45–46.)  Plaintiff had expressed concern that specific guards at SCI-Huntingdon
might retaliate against him because he had previously been charged with assaulting
a corrections officer at SCI-Rockview.  (Doc. 97-9.)  Defendant Deputy Secretary of
the Eastern Region of the Department of Corrections Donald Vaughn reviewed and
denied Plaintiff's transfer request, because he "felt that [Plaintiff] was only using the
request in order to transfer to an institution more to his liking."  (Doc. 97-12 ¶ 12.)
Additionally, psychologist Kenneth F. Ley submitted a request for transfer to a Long
Term Segregation Unit on Plaintiff's behalf, which was denied on May 19, 2006.
(Doc. 97-7, 97-9, 97-12.)  Finally, another request for Administrative Transfer was
denied on January 9, 2007.  (97-9.)

During his stay in the RHU, Plaintiff underwent periodic reviews in which PRC or a Unit Team[1] assessed Plaintiff's progress and adjustment. (Doc. 97-10.) On November 3, 2005, PRC found that the Letter justified a sixty day sentence. (*Id.*) On December 14, 2005, a Unit Team recommended placing Plaintiff in "administrative custody as he needs to be separated from SCI-HUN staff." (*Id.*) On May 31, 2006, PRC determined that "the Unit Team must come up with a plan by next PRC [for Plaintiff]" but recommended that Plaintiff remain in administrative custody because he "poses a danger to himself and others" and "has an extensive assaultive misconduct history." (*Id.*) On August 23, 2006, PRC found that Plaintiff's "adjustment within the RHU is described as satisfactory" by his counselor, but nonetheless determined that Plaintiff should remain confined until "his separation concerns are resolved." (*Id.*) At the August 23 meeting, Plaintiff stated that he no longer needed to be separated from the staff members at SCI-Huntingdon. (*Id.*) On November 15, 2006, PRC found that Plaintiff had regular contact with his counselor, described Plaintiff's adjustment within RHU as satisfactory, and commented that "RHU officers report no problems from Plaintiff this review period." (*Id.*) PRC, however, recommended that Plaintiff stay in the RHU due to his "extensive assaultive history" and prior request for separation from the staff. (*Id.*) On February 7, 2007, PRC continued to comment that Plaintiff had satisfactory adjustment, had regular contact with his counselor, and had no reported problems within the RHU. (*Id.*) Plaintiff remained in the RHU until July 17, 2007. (Doc. 97-3 at 68.)

---

[1]Defendants Lawler, Lockett, Hollibaugh, and Walters participated in these review committees.

### B.      Procedural History

In response to this punishment, on December 21, 2006, Plaintiff filed claims pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First and Fourteenth Amendments to the United States Constitution.  (Doc. 1.) Defendants filed timely an answer on March 13, 2007.  (Doc. 30.)  On May 1, 2008, Plaintiff filed a motion for summary judgment and supporting documents.  (Docs. 84–86.)  On May 7, 2008, Defendants filed a motion for extension of time to respond to Plaintiff's motion for summary judgment , which the court granted on May 7, 2008.  (Docs. 88–89.)  On June 25, 2008, Defendants filed a brief in opposition to Plaintiff's motion for summary judgment as well as a motion for summary judgment along with supporting documents.  (Docs. 95–99.)  On June 10, 2008, Plaintiff filed a brief in opposition to Defendants' motion for summary judgment as well as a statement of facts supporting his motion for summary judgment.  (Docs. 107–08.)  Neither party submitted a reply brief.  Pursuant to court order, the parties submitted additional briefing on Plaintiff's First Amendment claim pursuant to 42 U.S.C. § 1983.  (Docs. 115, 116.)  The motions are ripe for disposition.

### II.       Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231–32 (3d Cir. 2001).  A factual dispute is "material"

if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

**III.**        **Discussion**

Plaintiff's complaint suggests two distinct constitutional violations. First, Plaintiff alleges that Defendants violated his speech rights under the First Amendment by punishing him for the letter he drafted to Central Command, which contained protected speech.  Second, Plaintiff alleges that Defendants deprived him of liberty without due process of the law keeping him in the RHU for 638 days. Plaintiff has moved for summary judgment on these claims and Defendants filed a cross-motion for summary judgment, arguing (1) that Plaintiff's letter constituted a threat not protected by the First Amendment and (2) that Plaintiff had no liberty interest in being removed from the RHU.  The court will review each of these arguments in turn.

**A.   Threatening Speech**

Plaintiff and Defendants disagree on the threshold issue of whether the First Amendment protects Plaintiff's letter or whether the Letter contained a threat unprotected by the First Amendment.  Indeed, Defendants argue the issue in their briefs with the coolness of Frank Sinatra singing "All or Nothing at All," failing to cite a single federal case, failing to note the substantially diminished scope of the First Amendment in the prison context, and basing their argument on the proposition that "they would have been justified in filing criminal charges against the plaintiff for terroristic threats under [18 Pa. Con. Stat. Ann. § 2706]."  (Doc. 98 at 16.)  Plaintiff, in contrast, argues that the Letter did not constitute a threat, but merely abusive and hostile language, which the government may not punish without showing that the punishment necessarily or essentially served a substantial and important government interest.  Hence, to resolve the cross-motions for summary judgment, the court must

consider (a) whether the Letter constituted a threat and, (b) if not, whether punishing Plaintiff for posting the letter constituted a violation of Plaintiff's rights under the First Amendment.  As discussed below, the court finds that the Letter did not contain a true threat, but genuine issues of material fact exist concerning whether punishing Plaintiff was necessary to serve a substantial and important governmental interest.

### 1.   Whether the Letter Contained a True Threat

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Courts have acknowledged that the First Amendment protects "not only learned political discourse but also vituperative verbal and written attacks."  *United States v. Kosma*, 951 F.2d 549, 553 (3d Cir. 1991) (citing *Osborne v. Ohio*, 495 U.S. 103 (1990) (Brennan, J., dissenting) ("When speech is eloquent and the ideas expressed lofty, it is easy to find restrictions on them invalid.  But were the First Amendment limited to such discourse, our freedom would be sterile indeed.")).

The First Amendment, however, does not offer absolute protection. *Virginia v. Black*, 538 U.S. 343, 358 (2003).  The government may regulate certain narrowly limited categories of speech that fall outside the scope of the First Amendment.  *Id.*  For example, the First Amendment does not prohibit banning "true threats."  *Watts v. United States*, 394 U.S. 705, 708 (1969).  " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Virginia*, 583 U.S. at 359.  The speaker, however, "need not actually intend to carry out the threat," since "the prohibition on

true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 359–60.

The court uses an objective standard in determining whether a communication constitutes a true threat. *Kosma*, 951 F.2d at 557; *accord United States v. Oakley*, No. Cr. 02-123-01, 2003 WL 22425035, at *4 (E.D. Pa. May 30, 2003). Generally, courts take several factors into account when determining whether a communication constitutes a "true threat," including (1) the presence or absence of political context for the statements and the degree of political advocacy contained therein; (2) the conditional nature of the alleged threats; (3) the intended recipients of the message, whether it was the target of the threat or third persons; (4) whether the statements touched on "matters of public concern;" (5) the identity of the person who would carry out the threat (the speaker or some unidentified third party); and (6) the degree of specificity or ambiguity of the threat. *Kosma*, 951 F.2d at 554–55.

Considering these factors, the court finds that the Letter did not contain a true threat. The Letter—read in its entirety and considered in context—constituted an expression of frustration over being housed in SCI-Huntingdon where Plaintiff alleges he had been subject to severe mistreatment and over the failure of "Central Office" to respond to two prior letters he had sent. Plaintiff drafted the letter to draw attention to alleged mistreatment by SCI-Huntingdon personnel and to advocate for transfer to a separate institution.

Plaintiff undeniably presented these grievances in an abusive, hostile, incendiary, and socially unacceptable manner, but nothing in the Letter constituted an objective threat. While the Letter expresses rage through slang

and gratuitous vulgarities, Defendants point only to a single phrase as

constituting a threat:

> They sent me back here knowing that I had problems with these racist
> people.Wrote to Beard, the office of responsibility.My counselor wont
> do anything and he knows everything, they have already set me up. And
> Im going to tell you this my people no what's going on, and if anything
> happens here, in case I got to go to court, Im going to win because I
> suppose to be here in the first place.I try to respect people,But central
> office disrespect me knowing whats going on, so fuck all you racist
> motherfuckers, and *hope you bastards die a violent death*. (emphasis
> added).

The phrase "[I] hope you bastards die a violent death" taken in context, however,

does not constitute a conditional or actual threat, but expresses a desired outcome

without insinuating or otherwise suggesting that the speaker will engage in a course

of conduct likely to increase the probability of the desired outcome.  For this reason,

an objective listener reading the phrase "[I] hope you bastards die a violent death" in

the context of the Letter would take the phrase as an extreme and distasteful way of

saying "I hate you."  *Cf. Rankin v. McPherson*, 483 U.S. 378, 380, 386–87 (1987)

(finding clerical employees statement after hearing of an attempt to assassinate the

President "if they go for him again, I hope they get him" protected by First

Amendment").

Defendants present a slippery slope argument to counter this

interpretation.  Defendants argue that if the Letter did not constitute a threat, then

inmates could avoid punishment for making threats by merely placing the words "I

hope" before the threatening communication.[2]  While Defendants correctly point out

---

[2] Defendants argue that "[u]sing [Plaintiff's] logic an inmate could write to the warden or a
prison guard saying, 'I hope a group of inmates jump you in the yard and slice your throat and you die a
painful death' and not face any disciplinary consequences."  This argument fails.  While the court

(continued...)

that merely placing "I hope" before a communication does not necessarily make the communication non-threatening, the "conditional" or aspirational nature of the communication does have an effect on whether an objective observer would perceive the communication as a threat.  Here, the nature of the phrase, its construction, its lack of specificity, and the context in which it was presented would not likely place an objective observer in fear of violence.

The remaining factors also weigh towards a finding that the Letter did not constitute a threat.  First, Plaintiff did not direct the Letter at any particular individuals, but rather at an ambiguous group of people that make up the "Central Office."  Second, the Letter lacks any mention of who will carry out the supposed threat.  The suggestion that Plaintiff intended to cause the violent death of the "Central Office" or its employees seems far fetched, and the court finds that an objective observer would not interpret the communication as a threat, but an expression of hatred.  Last, as mentioned above, the Letter lacks specificity regarding who will carry out the alleged threat, who the threat targets, when or how the threat will be carried out, and any other details that might place a recipient of the Letter in fear of violence.

---

[2](...continued)

recognizes that every analogy must break down at some point—otherwise it would not be an analogy but a tautology—Defendants analogy breaks down at the point where the essential features of the two communications are compared.  First, an essential feature of the phrase in the Letter is the absence of specificity such that an objective observer would perceive the communication as an expression of hatred rather than a threat.  The hypothetical posed by Defendants abstracts this feature by increasing the level of specificity and creating a context in which an objective prison guard might actually fear that the communicator would "jump" him in the yard and "slice his throat."  Second, the government may, unquestionably, punish inmates for non-threatening, abusive and hostile language aimed at a "prison guard" under certain circumstances.

Oddly, Defendants argue in their supplemental brief that the lack of specificity does not carry significant weight when evaluating whether the Letter contained a threat.  (Doc. 116 at 4) ("[W]hile there were no specific words used saying that a specific individual was going to commit a specific act of violence against the prison officials it does not mean that the language is not "threatening.").  To support this position, Defendants point the court to a Commonwealth of Pennsylvania Superior Court case that affirmed a Court of Common Pleas, Juvenile Division ruling adjudicating a student delinquent after making terroristic threats against his drama teacher while in school.[3]  *In re J.H.*, 797 A.2d 260, 261 (Pa. Super Ct. 2002).  After the teacher threatened to report the student to his probation officer for repeatedly "ad libbing" the word "fuck" into the script of a school play, the student said to the teacher that if she did "it would be the last thing [she] ever did." *Id.*

The court disagrees that the comment in *In re J.H.* lacked specificity and otherwise finds significant distinctions between that case and the facts at hand. In *In re J.H.*, (a) the student intended the comment to control the behavior of the teacher, (b) the student conditioned the threat on the teacher reporting him for his outbursts, (c) the intended recipient and target of the threat was the teacher, who the student spoke to directly, and (d) the student indicated he would kill or otherwise

---

[3] Defendants fail to cite to a single case that supports the proposition that Plaintiff's letter constituted a true threat unprotected by the First Amendment in their initial brief.  (Doc. 98.)  In their supplemental brief, Defendants cite three Commonwealth cases, but only analogize the facts in the instant case to *In re J.H.*  (Doc. 116.)  Defendants also argue, "Not only did prison officials correctly discipline [P]laintiff for the language in his letter but they would have been justified in filing criminal charges against [P]laintiff for terroristic threats under [18 Pa. Cons. Stat. Ann. § 2706]."  This suggestion does not help the court in determining whether the First Amendment protects the Letter.

disable or debilitate the teacher if she engaged in a certain course of conduct.  In other words, the threat had a significant degree of specificity and otherwise would have placed an objective observer in fear of violence.  In contrast, the comment in Plaintiff's letter lacks any of this specificity and appears as no more than an abusive and hostile expression of hatred.  *Compare Bauer v. Sampson*, 261 F.3d 775, 780 (9th Cir. 2001) (finding statements published in school newspaper such as "In a room like that, no decent person could resist the urge to go postal" and "I, for one have etched the name of Sherry "Realpolitik' Miller White and others of her ilk on my permanent shit list, a two-ton slate of polished granite which I hope to someday drop [o]n Raghu Mathur's head" not true threats) *with United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996) (finding a true threat when the defendant sent more than fifty messages to an abortion clinic, including: "Robert remember Dr. Gunn . . . . This could happen to you . . . . Whoever sheds man's blood, by man his blood shall be shed.").

In sum, the Letter, undeniably, contained a generally socially unacceptable level of rage and hatred and used abusive and hostile language.  The court, however, after considering all the facts and arguments presented by both parties, finds that no genuine issue of material fact exists for trial, because no rational trier of fact could find that the Letter contained a true threat.

**2.    Whether Correctional Institution Could Punish Plaintiff for Using Abusive Language in Outgoing Mail**

An issue remains, nonetheless, regarding whether the correctional institution could punish Plaintiff for using abusive and hostile[4] language without violating the Constitution.  While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution" federal courts remain aware that "[r]unning a prison is an inordinately difficult undertaking." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).  Accordingly, although federal courts will not hesitate to "discharge their duty to protect constitutional rights," they exercise caution and due deference to the necessity of prison and inmate security.  *Procunier v. Martinez*, 416 U.S. 396, 405–406 (1974); *Nasir v. Morgan*, 350 F.3d 366, 370 (3d Cir. 2003). Thus, the first task before the court is to determine the appropriate standard of review for determining the constitutionality of punishing an inmate for sending an outgoing letter to another correctional institution, which contained abusive and hostile language.

**i.    Appropriate Standard of Review**

The Supreme Court, in *Procunier v. Martinez*, considered for the first time "the appropriate standard of review for prison regulations restricting freedom of speech."  416 U.S. 396.  In *Martinez*, the court reviewed the constitutionality of a prison regulation that restricted the personal correspondence of prison inmates.  The regulations at issue authorized censorship of statements that "unduly complain" or "magnify grievances," express "inflammatory political, racial, religious or other views," or are deemed "defamatory" or "otherwise inappropriate."  *Id.* at 415.  The

---

[4]  Plaintiff admits that the Letter contained abusive language.  (Doc. 97-3 at 82.)

Court held that censorship of prisoner mail is justified if the following criteria are met:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.

*Id.* at 413–14. The Court found the regulations at issue violated the Constitution because they authorized censorship of inmate mail beyond what any substantial and important penal interest in penal administration might demand.

The Court subsequently called into question the heightened level of scrutiny announced in *Martinez*, in *Turner v. Safley*, 482 U.S. 78 (1987), a case in which the Court considered the constitutionality of a prison regulation forbidding correspondence between certain inmates housed at different correctional institutions. The *Turner* Court upheld the regulation under a "reasonable relationship standard." Under the reasonable relationship standard Court's must consider: (1) whether there is a valid, rational connection between the prison regulation and a legitimate governmental interest, (2) whether alternative means of exercising the right in question remain open to inmates, (3) the impact that accommodating the asserted

prisoner right will have on the prison generally, and (4) whether there is an absence of ready alternatives. *Turner*, 482 U.S. at 89–90.

Although courts generally apply the *Turner* reasonable relationship standard when evaluating cases concerning the constitutional rights of inmates, the Supreme Court has held that *Turner* did not overrule *Martinez* and that the heightened standard of scrutiny still applies in certain cases. *Thornburgh v. Abbott,* 490 U.S. 401; *see also Nasir*, 350 F.3d at 370–71. In *Thornburgh*, the Court applied the *Turner* standard in upholding the constitutionality of prison regulations governing the receipt of subscription publications, but nonetheless narrowly construed the impact of the *Turner* holding on *Martinez*. *Nasir*, 350 F.3d at 370.

In narrowing the holdings of *Turner* and *Martinez*, the Court in *Thornburgh* revised and clarified the holding in *Martinez* by finding that the heightened standard of scrutiny announced in *Martinez* did not require a "least restrictive means" analysis:

> We do not believe that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict "least restrictive means" test. As noted, *Martinez* required no more than that a challenged regulation be "generally necessary" to a legitimate governmental interest. Certainly, *Martinez* required a close fit between the challenged regulation and the interest it purported to serve. But a careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case—outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security.

490 U.S. at 411 (citation and footnote omitted). The Court also limited *Martinez* to regulations dealing with outgoing correspondence by prisoners:

> Furthermore, we acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. As we have observed, outgoing correspondence was the central focus of our opinion in *Martinez*. The

implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.

*Id.* at 413.

As a practical result, the courts within the Third Circuit apply the *Turner* standard to incoming mail and the *Martinez* standard to outgoing mail. *Nasir*, 350 F.3d at 371 ("Because *Thornburgh* holds that *Turner* does not squarely overrule *Martinez* as applied to outgoing mail, we will apply *Turner* to incoming mail and *Martinez* to outgoing correspondence."). Plaintiff notes, and Defendants apparently concede (Doc. 98 at 13), that the Letter was outgoing mail. (*See* Doc. 115 at 2) ("The letter was written and directed at Central Office authorities. This letter was simply put in the prison mailbox and sent out the prison, just like any other mail.") (typographical errors in original). Accordingly, the court will review the constitutionality of the correctional institution's punishment of Plaintiff under the standard of review set forth in *Martinez* and clarified in *Thornburgh*.

### ii.   The Contents of the Letter

Plaintiff argues that, as a matter of law, Defendants violated his rights under the First Amendment by punishing him for engaging in protected speech. At issue is whether punishing Plaintiff for the Letter (1) furthered an important or substantial government interest unrelated to the suppression of expression and (2) was generally necessary such that the punishment closely fit with the interest. *Martinez*, 416 U.S. at 413; *Nasir*, 350 F.3d at 374. After Plaintiff sent the Letter to Central Command, he was found guilty of "Threatening an Employee" and "Using Abusive Language." Because the court finds that the regulations prohibiting "Threatening an Employee" and "Using Abusive Language" are generally necessary

to further the government's interest in maintaining safe and orderly correctional institutions, the sole issue before the court is whether these regulations as applied to Plaintiff violated the Constitution.

### aa. Substantial or Important Interest

Plaintiff correctly points out in his supplemental brief that Defendants have failed to set forth a governmental interest in punishing Plaintiff for the letter. *See Brooks v. Andolina*, 826 F.2d 1266, 1268 (3d Cir. 1987) ("If prison officials cannot censor unflattering statements made in letters to outsiders, they also may not punish an inmate for the contents of such letter."). Despite this failure, the court finds that a genuine issue of material fact exists as to whether the government has a substantial or important interest in censoring abusive and hostile language in outgoing letters directed to prison officials.

### bb. Generally Necessary

Defendants also fail to set forth an explanation as to why punishing Plaintiff was generally necessary to protect a governmental interest. Nonetheless, the court finds that a genuine issue of material fact exists regarding whether punishing Plaintiff for mailing the Letter was generally necessary to further a substantial or important governmental interest.

### iii. Personal Involvement of Individual Defendants

Neither party addresses the issue of whether the named individual defendants were sufficiently personally involved in the suppression of Plaintiff's speech to expose themselves to liability. Under § 1983, a plaintiff must show that each and every defendant was "personal[ly] involve[d]" in depriving him of his rights. *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2005). A defendant's

18

personal involvement may be shown through "allegations of personal direction [of the deprivation of rights] or of actual knowledge and acquiescence [in the deprivation]." *Evancho*, 423 F.3d at 353 (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  A question of material fact exists regarding the personal involvement of each of the named individual defendants in the alleged First Amendment violations.

### B.    Due Process Claim

Plaintiff's complaint alleges that Defendants deprived him of liberty without due process of the law by extending his initial sentence of sixty days to 638 days through a rubber stamping process that allowed Defendants to exact harsh punishment in retaliation for writing the letter.  The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law."  U.S. Cons. amend XIV.  The court has a two-step approach to analyzing a procedural due process claim:  the court must identify whether "the nature of the interest" falls "within the contemplation of the 'liberty or property' language of the Fourteenth Amendment" and if the Fourteenth Amendment protects the interest, then the court must determine what process is due.  *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000).  At issue in Plaintiff's motion and Defendants' cross-motion is (1) whether Plaintiff had a liberty interest in returning to the general population and (2) whether Defendants afforded Plaintiff due process by periodically reviewing Plaintiff's confinement in the RHU.  The court finds that Plaintiff lacked a liberty interest in returning to general population and, therefore, will not reach the second step of the due process analysis.

19

1.   **Liberty Interest**

Under the present facts, in order to determine whether the state has deprived Plaintiff of rights without due process, the court must confront the threshold issue of whether Plaintiff had a protected liberty interest. *Meachum v. Fano*, 427 U.S. 215, 223 (1976). As a general matter, courts have narrowly circumscribed the class of liberty interests protecting inmates. *Shoats,* 213 F.3d at 143. These interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted). In determining whether a prison has imposed an atypical and significant hardship, courts use "the ordinary incidents of prison life" as a starting point from which to ascertain "what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of the law." *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997).

While the Due Process clause does not give a prisoner a liberty interest in remaining among the general prison population, *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000), no bright-line rule exists for what constitutes atypical and significant hardship, and courts have reached differing outcomes in evaluating cases, "reflecting the fact-specific nature of the *Sandin* test." *Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003) (comparing case). Under *Sandin*, courts must consider (1) the duration of disciplinary confinement and (2) the conditions of that confinement in relation to other prison conditions. *Id.*

When considering administrative and disciplinary custody, courts have generally held that a liberty interest exists only where inmates have been held in administrative or disciplinary custody for unusually extreme lengths of time. *Gans v. Rozum*, 267 Fed. App'x 178, 180 (3d Cir. 2008) (finding that eleven years in administrative custody creates protected liberty interest); *Bowen v. Ryan*, 248 Fed. App'x 302, 304 (3d Cir. 2007) (holding that twenty years in administrative custody is "clearly" an atypical and significant hardship); *Shoats*, 213 F.3d at 144 (finding that eight years in administrative custody with no prospect of immediate release constitutes atypical and significant hardship). In cases in which an inmate has spent a substantial, but not atypical or extreme, amount of time in administrative or disciplinary custody courts have refused to recognize any protected liberty interest, even where the inmate is subjected to additional deprivations. *See, e.g.*, *Pressley v. Johnson*, 268 Fed. App'x 181, 184 (finding 360 days in the RHU does not constitute atypical and significant hardship); *Ayers v. Campbell*, 267 Fed. App'x 176, 177 (3d Cir. 2008) (finding no liberty interest implicated where inmate placed in the RHU for eight months); *Griffin v. Vaughn*, 112 F.3d 703, 705–08 (holding that fifteen months in administrative custody does not create liberty interest); *Pressley v. Blaine*, 544 F. Supp. 2d 446, 455–56 (W.D. Pa. 2008) (finding 1080 days in disciplinary custody does not create liberty interest).

The court has carefully reviewed the record before it and finds that Plaintiff did not have a liberty interest in being removed back into general population. Under such circumstances, the court does not believe that the Plaintiff had a liberty interest in returning to general population. The court, therefore, will not address the issue of whether the correctional institution afforded Plaintiff due

21

process.  The court will grant summary judgment for Defendants on Plaintiff's due process claim, because Plaintiff lacked a liberty interest in returning to general population.

**IV.**          **Conclusion**

In accordance with the foregoing discussion, Plaintiff's motion for summary judgment will be denied and Defendants' cross-motion for summary judgment will be granted in part and denied in part.  An appropriate order follows.


                                        s/Sylvia H. Rambo
                                        United States District Judge


Dated:  January 26, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN E. GRIFFIN,** | : | **CIVIL NO. 1:CV-06-02445** |
| **Plaintiff** | : | **JUDGE SYLVIA H. RAMBO** |
| | : | |
| **v.** | : | |
| | : | |
| **MELVIN S. LOCKETT, R.M.** | : | |
| **LAWLER, A. LOVETT, SCOTT** | : | |
| **WALTERS, and DONALD T.** | : | |
| **VAUGHN,** | : | |
| | : | |
| **Defendants** | : | |

## O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1) Plaintiff's motion for summary judgment (Doc. 83) is **DENIED**.

2) Defendants' cross-motion for summary judgment (Doc. 95) is **DENIED** as to Plaintiff's First Amendment claims and **GRANTED** as to Plaintiff's due process claim.

3) The Clerk of Court shall defer the entry of the grant of summary judgment until the conclusion of this case.

4) The Clerk of Court is directed to send to the parties a copy of this court's "Pretrial Memorandum" form.

5) This case is tentatively placed on the April 2009 trial list. This case is listed non-jury. Cases on the April 2009 list will begin at **9:30 a.m. on Monday, April 6, 2009**, in Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania. If counsel who intends to try the case has a conflict, the court must be notified immediately.

6) No later than **noon on Friday, March 6, 2009**, the parties shall file pretrial memoranda in accordance with the local rules of this court.  Plaintiff shall also file *in camera* with the court an addendum to the pretrial memoranda indicating the name and substance of the testimony of each witness the parties intend to call. Plaintiff is to note that "*in camera*" refers to the fact that the court will not disclose his witness list and proposed witness testimony.  **Failure to timely file pretrial memoranda or the required addendum may result in sanctions, including dismissal**.

7)  If the parties file trial memoranda, they must be filed five (5) business days before trial.

s/Sylvia H. Rambo
United States District Judge

Dated:  January 26, 2009.

2